Clifford GOLDY, an incompetent by Robert B. Elion, Esq., his guardian ad litem, et al.,

v.

Frank BEAL, Individually and as Secretary of Public Welfare of the Commonwealth of Pennsylvania, et al.

No. 75–791 Civil.

United States District Court, M. D. Pennsylvania.

July 8, 1976.

Robert B. Elion and Jon Lyons, Susquehanna Legal Services, Bloomsburg, Pa., David Ferleger, Mental Patient Civil Liberties Project, Philadelphia, Pa., for plaintiffs.

Norman Watkins, Deputy Atty. Gen., Harrisburg, Pa., Jonathan Vipond, III, Philadelphia, Pa., for defendants.

Before ROSENN, Circuit Judge, SHERIDAN, Chief District Judge, and NEALON, District Judge.

## MEMORANDUM

NEALON, District Judge.

Plaintiffs, inmates at Danville State Hospital in Danville, Pennsylvania, seek declaratory and preliminary and permanent injunctive relief under 42 U.S.C. § 1983 for alleged violations of their civil rights resulting from the operation of section 406 of the Pennsylvania Mental Health and Mental Retardation Act of 1966 (the Act), 50 P.S. § 4406 (section 406), which permits the involuntary and indefinite commitment of persons "in need of care and treatment" because of their "mental disability." [1] Plaintiffs seek to maintain this suit as a class action pursuant to Rule 23(b)(2), Federal Rules of Civil Procedure, on behalf of all persons who are or may be involuntarily confined to state mental facilities pursuant to section 406. They contend that the term "mental disability," as defined in the Act, is vague and overbroad in violation of the due process clause of the Fourteenth Amendment to the United States Constitution.[2]

---

1. Section 406 is set out in pertinent part, *infra,* in the course of a brief discussion of the statutory scheme of the Act.

2. It should be pointed out here that plaintiffs do not contend that the defendants failed to provide them care and treatment. Nor do they maintain that they were denied any procedural safeguards, such as a hearing or the appointment of counsel, in connection with their commitment. They challenge only the standard by which they were committed, as set forth in sections 102 and 406 of the Act. *See infra.*

Following the filing of the complaint on July 8, 1975 and the granting of leave for plaintiffs to proceed *in forma pauperis* on July 10, 1975, a three-judge district court was convened on July 14, 1975 pursuant to 28 U.S.C. §§ 2281 and 2284; and, in accordance with Rule 65(a)(2), Federal Rules of Civil Procedure, the trial of the action on its merits was ordered to be advanced and consolidated with the hearing for a preliminary injunction. A final hearing was held on August 4, 1975. Thereafter, counsel submitted a stipulation of the facts pertinent to this case and, by November 11, 1975, had filed briefs on all of the issues raised herein. The following discussion constitutes this Court's findings of fact and conclusions of law. Rule 52(a), Federal Rules of Civil Procedure.

On the basis of the stipulation submitted by counsel, the following relevant facts appear. Plaintiff Clifford Goldy is seventy-three years of age. He is a resident of Williamsport, Lycoming County, Pennsylvania and is a citizen of the United States. Goldy is presently involuntarily confined to Danville State Hospital and has been since November 14, 1968.

Plaintiff Madelyn Maietta is forty years of age. She is a resident of Williamsport, Lycoming County, Pennsylvania and is a citizen of the United States. She is presently confined to Danville State Hospital and has been since July 3, 1972, released only for occasional trial visits with relatives.

Plaintiff Fred Fogle is twenty-seven years of age. He is a resident of Sunbury, Northumberland County, Pennsylvania and is a citizen of the United States. He is presently involuntarily confined to Danville State Hospital and has been since January 24, 1975.

Plaintiff Scott Wagner is twenty years of age. He is a resident of Mifflinburg, Union County, Pennsylvania and is a citizen of the

United States. He is presently involuntarily confined to Danville State Hospital and has been since March 3, 1974, interrupted only by a trial visit from July 18, 1974 to February 14, 1975.[3]

All named plaintiffs have been committed to Danville State Hospital into locked wards against their will. They have been committed by defendants or under their directions pursuant to section 406 of the Act, after a hearing and finding that they were "mentally ill."

Defendant Frank Beal is Secretary, Department of Public Welfare, Pennsylvania. He is charged, under 71 P.S. § 66, with responsibility for exercising the powers and performing the duties vested in and imposed by law on the Department of Public Welfare, including supervision of mental institutions.

Defendant Robert Gatski, M.D. is Superintendent of the Danville State Hospital, Danville, Pennsylvania and is charged with the administration and supervision of that institution. Gatski or his assistant is responsible for receiving all patients committed under section 406 of the Act.

Defendant Judge Charles F. Greevy is President Judge of the Court of Common Pleas of Lycoming County, Pennsylvania, in which capacity he committed plaintiff Clifford Goldy on September 1, 1971 and plaintiff Madelyn Maietta on July 3, 1972 to Danville State Hospital against their will by authority of section 406 of the Act.

Defendant Judge Michael Kivko is Judge of the Northumberland County Court of Common Pleas, in which capacity he committed plaintiff Fred Fogle on January 24, 1975, to Danville State Hospital against his will by authority of section 406 of the Act.

Defendant Judge Thomas Wilson is Judge of the Court of Common Pleas of Union County, Pennsylvania, in which capacity he committed plaintiff Scott Wagner on March 13, 1974, to Danville State Hospi-

---

**3.** For some inexplicable reason, perhaps oversight on the part of counsel, no details concerning plaintiff Wagner's confinement were included in the stipulation of relevant facts. As no testimony concerning any of the plaintiffs

was taken during the trial of this case, this Court has no basis for making any findings regarding the details of Wagner's confinement. *See infra* for details concerning the other plaintiffs' confinement.

tal against plaintiff's will by authority of section 406 of the Act.

### Goldy

Plaintiff Goldy has been a patient at Danville State Hospital on four separate occasions. Each commitment has been involuntary, always at the insistence of someone else that institutionalization was in Goldy's best interest.

Goldy, an established lumber dealer, was first committed to Danville State Hospital on March 8, 1961 on two physicians' certificates pursuant to a statute which has since been repealed by the Pennsylvania Mental Health and Mental Retardation Act of 1966. He was unconditionally discharged on May 27, 1961.

On August 27, 1964, Goldy was involuntarily committed to Danville State Hospital after a court-appointed commission found Goldy showed "increased psychomotor activity, was easily angered—lacked insight and reasoning ability." Goldy was discharged after four and one-half months on January 19, 1965.

On November 14, 1968, Goldy was committed to Danville State Hospital for a third time, by means of a "physicians certificate" authorized under section 404 of the Act which was subsequently declared unconstitutional. *Dixon v. Attorney General of Commonwealth of Pennsylvania*, 325 F.Supp. 966 (M.D.Pa.1971).

On July 7, 1971, to comply with *Dixon*, Danville State Hospital changed Goldy's commitment from a section 404 to a Voluntary Admission under section 402 of the Act.

On or about August 10, 1971, Goldy expressed his desire to leave Danville, feeling he no longer needed care and treatment and that he could exist in his home environment without problem. Under section 402, it was his right to leave anytime. Plaintiff Goldy had done nothing to endanger himself or others while in the institution or on his frequent visits home, and his records show he was a cooperative patient.

Despite Goldy's improved condition, on August 18, 1971, David Goldy, the plaintiff's son, petitioned the Lycoming County Court of Common Pleas to commit Goldy against his will on the grounds that his father's "attending psychiatrist has indicated that he is not mentally competent enough to live in a non-supervised society, and based on my association with him, I agree with the psychiatrist."

Goldy has shown no dangerous behavior in the hospital or on home visits. His only questioned behavior was to "bother" and "irritate" his family on home visits by talking about new plans for his business.

On September 1, 1971, the two physicians who examined Plaintiff Goldy, against his will, reported to the Court pursuant to section 406 that plaintiff was mentally ill and in need of care and treatment. Their examination revealed nothing to indicate plaintiff would harm himself or others, but only that plaintiff "has remained in a manic psychosis with euphoria, ceaseless talking and expansive business thoughts."

On September 1, 1971, a hearing before defendant Judge Charles F. Greevy was held, at which time defendant Greevy indefinitely committed plaintiff Goldy to Danville by authority of section 406 of the Act.

The continued incarceration of Goldy takes place despite the fact that Goldy's doctor in the institution has recently admitted that Goldy is neither dangerous to himself or to others.

### Maietta

Plaintiff Maietta was previously committed to Danville against her will on two occasions, on November 24, 1958 and on July 23, 1969. She was discharged after each commitment. After her first discharge, she remained out of mental hospitals for nearly eight years, working as a registered nurse in several convalescent homes. During that time, she lived alone in Williamsport.

On or about June 15, 1972, Maietta became involved in a dispute with her landlady who eventually padlocked Maietta out of

her apartment. Maietta tried to re-enter the apartment to regain her possessions but was apprehended by the police. The police referred her to the Lycoming County Mental Health Office for a 10-day commitment under section 405 of the Act.

The Mental Health Office believed Maietta to be "confused, delusional and irrational," and petitioned to commit Maietta despite the fact that Maietta insisted that she was not in need of care and treatment. Two examining physicians thought that Maietta "suffered from Paranoid tendencies." There was nothing in their reports to show she was harmful or dangerous to herself or to others.

On July 3, 1972, defendant Judge Charles F. Greevy of the Lycoming County Court of Common Pleas indefinitely committed Maietta to Danville against her will, for care and treatment, by authority of section 406 of the Act. Maietta objects to being committed as she has not presented a problem of danger to herself or to others.

### Fogle

On January 10, 1975, plaintiff Fogle was picked up by the Sunbury police and referred to the Northumberland County Mental Health Office on a complaint from the management of the Edison Hotel that Fogle was showing "bizarre behavior." Fogle was committed to Danville State Hospital for a 10-day period pursuant to section 405 of the Act.

On January 24, 1975, Fogle was involuntarily committed to Danville by defendant Judge Michael Kivko after a Master's hearing elicited testimony that Fogle's behavior had been diagnosed by two psychiatrists as "Schizophrenia, Paranoid Type." There was no determination that Fogle was dangerous to himself or others either during the 10-day commitment or prior to the commitment.

### Discussion

Before reaching the merits of plaintiffs' claims, some threshold issues raised by the defendants must be considered. They are (1) whether this Court should abstain from deciding this case, either under the doctrine of *Railroad Commission v. Pullman Company*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) which holds that a federal court should not decide a case challenging state action as contrary to the federal constitution where there are questions of state law that may be dispositive of the case, or under the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), which provides that federal courts should refrain from enjoining certain ongoing state court proceedings; (2) whether the rule of *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) prevents plaintiffs from seeking relief under 42 U.S.C. § 1983 because they are actually challenging the fact or duration of confinement and, thus, a writ of habeas corpus is their sole federal remedy; and (3) whether the defendant judges are immune from this suit under the doctrine of judicial immunity.

The abstention issues require little comment. Defendants maintain that this Court should abstain under the *Pullman* rationale in order to afford the Pennsylvania state courts the opportunity to construe section 406 in a manner that would avoid the constitutional problems of vagueness and overbreadth. The short answer to this contention is that the Pennsylvania Supreme Court recently declined an opportunity to rule on the constitutionality of section 406, in *Commonwealth ex rel. Finken v. Roop*, 234 Pa.Super. 155, 339 A.2d 764 (1975), petition for allocatur denied, October 17, 1975. In *Finken*, a habeas corpus action challenging a commitment pursuant to section 406, the Pennsylvania Superior Court, in a 4–3 opinion, ordered the petitioner discharged for failure to comply with the procedural requirements of the Act itself. Three of the judges also reached the constitutional issues raised by the petitioner, and held, *inter alia*, that the commitment standards of section 406 were void for vagueness. *Id.* at 179–184, 339 A.2d 764. The Pennsylvania Supreme Court's denial of allocatur in *Finken* means that there is no prospect of a Pennsylvania Supreme Court

decision regarding the constitutionality of section 406 in the near future. Because a federal court may not abstain "'simply because the rights asserted may be adjudicated in some other forum,'" *Zwickler v. Koota,* 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444 (1967), citing *Stapleton v. Mitchell,* 60 F.Supp. 51, 55 (D.Kan.1945), this Court declines defendants' invitation to abstain in this case.

■ Defendants' *Younger v. Harris* argument is equally without merit. The *Younger v. Harris* doctrine only applies when a federal court is asked to enjoin or interrupt an on-going state court proceeding in which the federal plaintiffs will have an opportunity to have their claims adjudicated. *See Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). There presently exists no state court proceeding whatsoever involving these plaintiffs, and no such proceeding is imminent. *Younger v. Harris,* therefore, simply does not apply to this case.

Defendants next argue that plaintiffs may not challenge in a section 1983 suit the constitutionality of the statute under which they were committed, but must instead proceed under the federal habeas corpus statute, 28 U.S.C. § 2254, which requires exhaustion of available state remedies prior to proceeding in federal court. As this argument is based on *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), we turn to an examination of that case.

In *Preiser,* the Supreme Court held that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Id.* at 500, 93 S.Ct. at 1841. Plaintiffs in *Preiser* were state prisoners who sued under 42 U.S.C. § 1983 alleging that they had been deprived of good-time credits in administrative disciplinary proceedings that were conducted with a lack of procedural due process. The specific relief sought was a restoration of such

credits. By the time their complaints were filed in the district court, such relief would have resulted in their immediate release. The Court held that because the suits were within the core of habeas corpus, in that they challenged the fact or duration of confinement and sought immediate release from that confinement, they should have been dismissed and plaintiffs should have been ordered to proceed in habeas corpus. Moreover, the Court was careful to emphasize that the result would have been the same if the practical effect of a grant of the requested relief had been merely a shortening of the duration of the sentence rather than immediate release. "[T]he heart of habeas corpus . . . [is a challenge to] the fact or duration of . . . physical confinement itself, and . . . [the] seeking [of] immediate or a speedier release from that confinement . . ." *Id.* at 498, 93 S.Ct. at 1840.

■ Defendants maintain that this case is controlled by *Preiser* because plaintiffs are challenging the constitutionality of the statute under which they were committed, and the inevitable effect of that challenge, if it is successful, will be their release from custody. Plaintiffs, on the other hand, argue that this case is distinguishable from *Preiser* because they are not asking this Court to order their release from custody. Instead, they maintain, they merely seek a declaration that the statute under which they were committed is unconstitutional and an injunction enjoining defendants from enforcing and executing the statute in its present version; if this Court rules in their favor, they will then seek release in state court. In essence, their position is that the *Preiser* issue turns on the relief sought. Because they do not seek release, they maintain, they are not required to proceed in habeas corpus.

Several cases decided since *Preiser* would appear to support plaintiffs' proposed distinction from that case. In *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), plaintiffs were pretrial detainees who were being held for trial under a prosecutor's information and who had not had

any judicial determination of probable cause. They brought a section 1983 action in the district court, claiming a constitutional right to a judicial hearing on the issue of probable cause and requesting an order that the state authorities afford them a probable cause determination. The Court held that "[b]ecause release was neither asked nor ordered, the lawsuit did not come within the class of cases for which habeas corpus is the exclusive remedy." *Id.* at 107 n. 6, 95 S.Ct. at 859. *See also Gomez v. Miller,* 341 F.Supp. 323 (S.D.N.Y.1972) (3-judge court), which was decided prior to the decision in *Preiser,* but was affirmed summarily following *Preiser* in *Miller v. Gomez,* 412 U.S. 914, 93 S.Ct. 2728, 37 L.Ed.2d 141 (1973). Because plaintiffs in this case do not request release from custody, they are not required to proceed by habeas corpus. *Accord, Bradford v. Weinstein,* 519 F.2d 728, 730 (4th Cir. 1974), *vacated and remanded as moot, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975);* and Pope v. Chew, *521 F.2d 400, 406 n. 8 (4th Cir. 1975).[4]*

■ The contention that the defendant judges are immune from this suit under the doctrine of judicial immunity may be disposed of summarily. Plaintiffs seek only equitable relief here, in the form of a declaratory judgment and "preliminary and permanent injunctions enjoining Defendants from enforcing and executing" section 406. Complaint, p. 12. They do not request damages. The courts have consistently held that the doctrine of judicial immunity does not apply to a request for equitable relief under 42 U.S.C. § 1983. *United States v. McLeod,* 385 F.2d 734, 738 n. 3 (5th Cir. 1967); *Erdmann v. Stevens,* 458 F.2d 1205, 1208 (2d Cir. 1972), *cert. denied,* 409 U.S. 889, 93 S.Ct. 126, 34 L.Ed.2d 147 (1972). Accordingly, defendant judges are not immune from the relief sought here.

Turning to the merits, we set forth first the relevant portion of section 406, together with a brief analysis of the statutory scheme of the Act. Section 406 provides in pertinent part:

"(a) Whenever a person is believed to be *mentally disabled,* and in need of care or treatment by reason of such *mental disability,* and examination of such person has been made by a physician or physicians, or for any reason the examination of such person cannot be made, a petition may be presented to the court of common pleas of the county in which a person resides or is, for his immediate examination or commitment to an appropriate facility for examination, observation and diagnosis.

(1) The petition may be made by a relative, guardian, friend, individual standing in loco parentis or by the executive officer or an authorized agent of a governmental or recognized non-profit health and welfare organization or agency or any responsible person.

(2) The petition shall set forth the facts upon which the petitioner bases his belief of mental disability and the efforts made to secure examination of the person by a physician.

(3) Said court upon consideration of such petition shall: (i) issue a warrant requiring that such person be brought before said court; (ii) fix a date for a hearing which shall be as soon as the warrant is executed, and (iii) notify the parties in interest.

(4) After hearing, said court may: (i) order an immediate examination by two physicians appointed by said court, or (ii) order the commitment of the person believed to be mentally disabled, to a facility for a period not exceeding ten days for the purpose of examination. If the examination can be accomplished by partial hospitalization said court may so direct.

"(b) If, upon examination, it is determined that such person is in need of care

---

4. Moreover, plaintiffs and the members of their class seek to enjoin the enforcement of only one section of the statute. It may be that involuntary commitment would be appropriate under some other section of the Act, for exam-ple, section 405. It is also possible that some members of plaintiffs' class would desire to remain committed voluntarily, pursuant to section 403 of the Act.

at a facility, the examining physicians or director, as the case may be, shall immediately report to said court which may order the commitment of such person for care and treatment." (emphasis supplied)

50 P.S. § 4102 (Section 102) in turn defines "mental disability" as follows:

" 'Mental Disability' means any mental illness, mental impairment, mental retardation, or mental deficiency which so lessens the capacity of a person to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under care as provided in this act. It shall include conditions and terms heretofore defined as 'insanity,' 'unsoundness of mind,' 'lunacy,' 'mental disease,' 'mental disorder,' 'feebleminded,' 'moron,' 'idiot' and 'imbecile.' The term shall not include senility, unless mental illness or mental retardation is superimposed."

Section 406 should be distinguished from section 405 of the Act, 50 P.S. § 4405, which provides for the emergency commitment of "a person [who] appears, by reason of his acts or threatened acts, to be so mentally disabled as to be dangerous to himself or others and in need of immediate care." Section 405 is not under attack here.

Section 406 should also be distinguished from section 404 of the Act, 50 P.S. § 4404, which provides for involuntary commitment on the basis of a direct application to a mental health facility by a relative, guardian or other interested person, as opposed to commitment by judicial proceeding, provided for by section 406. Section 404 permits the commitment of persons who are "mentally disabled and in need of care" on the basis of an application by "a relative,

guardian, friend, individual standing in loco parentis to the person to be committed, or by the executive officer or an authorized agent of a governmental or recognized non-profit health or welfare organization or agency or any responsible person." The application must "be accompanied by the certificates of two physicians who have examined the person whose commitment is sought, within one week of the date of the certificates, and who have found that, in their opinion, such person is mentally disabled, and in need of care." Section 404 was held unconstitutional under the due process clause of the Fourteenth Amendment in *Dixon v. Attorney General of Commonwealth of Pennsylvania*, 325 F.Supp. 966, 972 (M.D.Pa.1971) (3-judge court).

Plaintiffs attack section 406 on two Fourteenth Amendment due process grounds. They argue first that it is unconstitutionally vague, both because of its failure to give fair warning of the conduct which will result in commitment, and because of its lack of standards restricting the discretion of the court which orders commitment. *Cf. Papachristou v. City of Jacksonville*, 405 U.S. 156, 165–170, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). Secondly, they maintain that section 406 is impermissibly overbroad because it permits "the commitment of individuals who the Commonwealth has no legitimate interest in incarcerating." Plaintiffs' Post Trial Brief, at 16. *Cf. NAACP v. Alabama*, 377 U.S. 288, 307, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964).[5] Because we find that section 406 is unconstitutionally vague, *see infra*, there is no need to address plaintiffs' overbreadth argument.

The void for vagueness doctrine requires statutes to be drawn with sufficient definiteness and specificity to provide fair warning of the conduct proscribed by

---

**5.** Defendants offer little resistance to these contentions, arguing weakly that the cases which have invalidated the civil commitment standards of other states on similar grounds involved statutes that were vaguer and broader than the statute at issue here, and that the problem of determining constitutionally permissible standards for civil commitment is so difficult that this Court should abstain from deciding this case. Defendants' Trial Brief, 15–18. We find neither argument persuasive. The extent of the infirmity of other civil commitment statutes has little bearing on whether Pennsylvania's standard for non-emergency civil commitment passes constitutional muster. And we have already held that this is not an appropriate case for abstention.

the law and to restrict the discretion of governmental authorities or courts in enforcing the law. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 165–170, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). Although it has generally been applied to criminal statutes, *see, e. g., id.* (vagrancy statute), the doctrine has also been used to strike down civil sanctions authorized by overly vague statutes. See *Giaccio v. Pennsylvania*, 382 U.S. 399, 402, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966) (imposition of trial costs). It always operates when a statute's vagueness creates the possibility that it can be applied in an arbitrary manner that infringes on such fundamental interests as First Amendment rights of speech and assembly, or the right of physical liberty. *See generally*, Note, *The Void-For-Vagueness Doctrine*, 109 Pa.L. Rev. 67 (1960).

█ Applying the vagueness standard to section 406, it is clear that the statute does not pass constitutional muster. The key term in the statute is the "mental disability" on account of which a person in need of care may be committed. "Mental disability" in turn is defined in Section 102 as "any mental illness, mental impairment, mental retardation, or mental deficiency which *so lessens the capacity of a person to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under care as provided in this act.*" (emphasis supplied) The operative words are italicized. The most apparent aspect of the Pennsylvania civil commitment standard as embodied in sections 406 and 102 is that it is circular—a person may be committed if he is *in need of care* because of a mental disability which so lessens his capacity "as to make it *necessary or advisable for him to be under care . . . .*" Thus, the primary restriction on the discretion of a court to order commitment pursuant to section 406 is the requirement that the person to be committed be *in need of care* because of reduced capacity to use his customary self-control, judgment and discretion in the conduct of his affairs. Such a standard is impermissibly vague, if only because the key phrase "in need of

care" is susceptible of several interpretations. How incapacitated must a person be before he needs care within the meaning of the statute? Must he be completely incapable of conducting his own affairs, or may he be committed if he simply cannot conduct his affairs as well as most other people? And what is meant by "care"? Does it mean active medical treatment under the supervision of doctors and other medical personnel, or does it simply mean providing for the committed person's basic needs? Such lack of specificity in a statute that authorizes an interference with the constitutionally protected right of physical liberty places insufficient limits on the discretion of officials who are responsible for its implementation, with the result that there is nothing in the statute to prevent it from being enforced arbitrarily. Such a result amounts to vagueness that violates due process. See *Kendall v. True*, 391 F.Supp. 413, 418 (W.D.Ky.1975); *Bell v. Wayne County General Hospital*, 384 F.Supp. 1085, 1096 (E.D.Mich.1974).

Having concluded that section 406 is unconstitutionally vague, it remains to be considered whether this suit may be maintained as a class action. Plaintiffs seek to maintain this suit as a class action on behalf of all persons who are or may be involuntarily confined to state mental health facilities pursuant to section 406. In order for a suit to be maintainable as a class action, the four prerequisites of Rule 23(a), Federal Rules of Civil Procedure must be satisfied, and, in addition, one of the provisions of Rule 23(b) must be met. Plaintiffs seek to qualify under Rule 23(b)(2), which requires a finding that

"the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole;"

Defendants oppose plaintiffs' request to have this suit maintained as a class action, but offer no arguments in support of their opposition.

Upon analysis, we conclude that the requirements of Rule 23 have been met and that this suit may be brought as a class action. Rule 23(a) provides that a class action may be maintained if

"(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class."

The first three prerequisites clearly are met here and require no analysis. Only the fourth requirement is questionable here, because of the possibility that persons confined to a mental institution may not be capable of fairly and adequately protecting the interests of the class. Although other courts have not found that possibility to be an obstacle to permitting inmates of mental institutions to act as representatives of a class, *see, e. g., Lynch v. Baxley*, 386 F.Supp. 378, 386 (E.D.Ala.1974), we have obviated the necessity of determining the consequences of that possibility by appointing a guardian ad litem to represent the plaintiffs in the prosecution of this suit. *See Dixon v. Attorney General of Commonwealth of Pennsylvania*, 313 F.Supp. 653, 655–656 (M.D.Pa.1970) (3-judge court). The suit is properly maintainable as a Rule 23(b)(2) class action because the defendants have acted or may act pursuant to section 406 with respect to the plaintiff class as a whole, and final injunctive or declaratory relief, settling the legality of the behavior with respect to the class as a whole, is appropriate. *See* Advisory Committee Note to Rule 23(b)(2). *Accord, Dixon v. Attorney General of Commonwealth of Pennsylvania*, 325 F.Supp. 966, 973 (M.D.Pa.1971) (3-judge court); *Lynch v. Baxley*, 386 F.Supp. 378, 386 (E.D.Ala.1974) (3-judge court); *and Lessard v. Schmidt*, 349 F.Supp. 1078, 1103 (E.D.Wis.1972) (3-judge court), *vacated and remanded on other grounds*, 415 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974).

In accordance with the foregoing, judgment will be entered declaring section 406 unconstitutional under the due process clause of the Fourteenth Amendment, and permanently enjoining the defendants from enforcing and implementing section 406 with respect to plaintiffs and members of their class.

## ORDER

Now, this 8th day of July, 1976, in accordance with memorandum this day filed, Section 406 of the Pennsylvania Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4406, is hereby declared to be impermissibly vague in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; this suit is hereby certified as a class action, pursuant to Rule 23(b)(2), Fed.R.Civ.P., on behalf of all persons who are or may be involuntarily confined to state mental health facilities pursuant to Section 406; and the defendants are hereby permanently enjoined from enforcing and implementing Section 406 with respect to plaintiffs and members of their class.

## STAY ORDER

AND NOW, this 19th day of July, 1976, upon consideration of the defendants' motion for stay, briefs of the parties, and after hearing oral argument, it is hereby ORDERED:

1. On July 8, 1976, this court declared unconstitutional and enjoined the operation of section 406 of the Mental Health and Mental Retardation Act of 1966, 50 P.S. 4406.

2. On July 9, 1976, Pennsylvania enacted the Mental Health Procedures Act, Act 143, which, with regard to the mentally ill, repeals section 406 as of September 7, 1976. The new law does not affect the mentally retarded.

3. In order to avoid the development of any crisis or emergency, this Stay Order is entered.

4. Until September 7, 1976, commitments under section 406 may be processed provided that Defendant Beal, his agents and assigns, those under his direction, and

all facility directors shall not receive any person except upon judicial determination that the following standard is met:

Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

Determination of Clear and Present Danger. (1) Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. If, however, the person has been found incompetent to be tried or has been acquitted by reason of lack of criminal responsibility on charges arising from conduct involving infliction of or attempt to inflict substantial bodily harm on another, such 30-day limitation shall not apply so long as an application for examination and treatment is filed within 30 days after the date of such determination or verdict. In such case, a clear and present danger to others may be shown by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that such conduct will be repeated.

(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act; or

(iii) the person has severely mutilated himself or attempted to mutilate himself severely and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act.

5. Defendant Beal shall, within 5 days, inform all President Judges of the Pennsylvania Courts of Common Pleas of this Order. Furthermore, Defendant Beal, within 5 days, shall inform all facilities which receive § 406 commitments of this Order and, within 20 days, shall publish this Order in the Pennsylvania Bulletin requiring all county mental health/retardation offices and facilities to adhere to it.

6. Defendant Beal shall, within 7 days, cause this Order to be posted in the living areas and public areas of all state mental facilities.

7. This Stay Order does not affect the right of members of the plaintiff class (that is, all persons who are or may be committed under section 406) to seek release or other relief in the state courts. Further, this Stay Order does not affect the class determination or declaratory relief granted by the July 8, 1976, decision and order.

8. This stay in no way prejudices or otherwise affects the parties' rights to file proper and timely post-trial motions and appeals with respect to, and from, the July 8, 1976, decision and order.